# Williams *v.* Patterson, Appellant.

*Contract—Implied contract—Board of horse—Mailing letters—Evidence.*

In an action to recover for the board of a horse for three years, the evidence showed that the plaintiff had bought a stock farm and that the horse in question was on the farm when he took possession. It appeared that the defendant, who owned the horse, had directed the plaintiff's predecessor to kill it, as it was worthless and suffering, but this had not been done. These facts were known to the plaintiff. The plaintiff testified that after keeping the horse for a while, he sent a bill to the defendant, but he offered no evidence of the contents of the bill, or that the bill identified the horse, so that the defendant would know that the plaintiff was keeping the horse. It also appeared that plaintiff knew that he was sending the bills to a wrong address, and also that the defendant had no knowledge of the plaintiff's purchase of the farm. *Held,* that the court should have given binding instructions for defendant.

Argued Oct. 21, 1908. Appeal, No. 243, Oct. T., 1907, by defendant, from judgment of C. P. No. 4, Phila. Co., March T., 1906, No. 2,829, on verdict for plaintiff in case of Morris Williams v. Theodore Cuyler Patterson. Before RICE, P. J., PORTER, HENDERSON, MORRISON, ORLADY, HEAD and BEAVER, JJ. Reversed.

Assumpsit for boarding a horse. Before CARR, J.
The facts appear by the opinion of the Superior Court.

The court charged in part as follows:
[If you believe that Williams received the mare, intending to charge board and not knowing that Patterson believed it to be dead, and if you believe he sent the bills on July 1 and that Patterson had received them, of course, that would be a fact from which you could infer an implied contract that Patterson knew that the mare was alive and that he was responsible for its keep.] [3]
[There are certain transactions in the law in which the implication can be made from that action that the addressee re-

ceived the letter. If you believe he did not receive the letters, or bills, then you should find for him and not for the plaintiff.] [4]

Verdict and judgment for plaintiff for $353. Defendant appealed.

*Errors assigned* were (3, 4) above instructions, quoting them, and (5) in refusing binding instructions for defendant.

*T. C. Patterson,* with him *Jos. Gilfillan,* for appellant.

*David Wallerstein,* for appellee.

Opinion by Beaver, J., February 26, 1909:

Plaintiff seeks, as set forth in his statement of claim, to recover from the defendant for the board of a brown mare from April 1, 1903, to April 1, 1906, at $12.00 per month. There is no allegation that there was an express contract on the part of the defendant to pay the plaintiff for the board of this animal. The plaintiff's statement shows the circumstances under which it was received by the plaintiff: "On April 1st, 1903, the plaintiff rented Erdenheim stock farm, Montgomery county, Pa., and purchased from John McCloskey estate the good will of the boarding business upon said farm. Among other horses turned over by John McCloskey estate, which had been at board with it for the plaintiff to board, was a brown mare of defendant's, and the said mare had been boarded by the plaintiff at said farm from that time to the present, to wit, April 1st, 1906."

It appears by the testimony of the defendant and of the executor of McCloskey that, prior to the sale by the McCloskey estate to the plaintiff of the lease and good will of the Erdenheim stock farm, the defendant had directed a certain black mare called Lillian, then kept by the McCloskey estate, to be killed, on the ground that she was worthless and was suffering. McCloskey's executor testified that he did not kill the mare and had made no charge for her keep after the defendant's directions to have her killed, and that he communicated these facts to the plaintiff. This is not denied in any way by the plaintiff.

It is testified by the plaintiff that, after keeping this mare

for a certain time, he sent a bill for her keep to the defendant, addressed to Chestnut Hill. It is evident from all the testimony, not only of the defendant, but of the plaintiff as well, who sent a messenger or messengers to Chestnut Hill to ascertain whether or not the defendant lived there, that the defendant was not then living at Chestnut Hill. The plaintiff alleges that he sent bills addressed to Chestnut Hill every six months from April 1, 1903, until the year 1905, and that during that year he sent bills every month. What was contained in these bills is not shown, nor were the books of the plaintiff produced to identify in any way the amount or for what the bills were rendered, although he was requested at the trial to produce his books.

If we could assume, under the evidence, that the defendant had received the bills rendered by the plaintiff, did these bills convey to him the notice that his black mare Lillian was being kept and boarded by the plaintiff? The testimony does not show this. The plaintiff testifies, in answer to a question by the court, that, when he took the farm, he found there "a black horse, a black mare, with a long tail, called Lillian." It is not shown by the testimony that the defendant had any knowledge of the sale of the lease and good will of the Erdenheim farm to the plaintiff. Assuming that the plaintiff sent the bills regularly, as he testified, and that the defendant received them, did they convey notice in any way that the plaintiff had succeeded to the care of the stock upon the Erdenheim farm and that his mare Lillian was being boarded by the plaintiff presumably at his expense, notwithstanding the fact that the defendant had directed the mare to be killed? If these facts had been clearly shown by the plaintiff and that he addressed a letter containing a bill giving the specific information necessary to acquaint the defendant with the facts above mentioned, it might be presumed, if the letter were addressed to the defendant's proper post-office address, that he received such letter, and that the description of the mare and the fact that he was the keeper of the Erdenheim farm was contained therein, a contract to pay for the mare might have been implied. In the absence of such testimony, however, we are of opinion that there was not sufficient in the testimony of the plaintiff, or taking the testimony

as an entirety, that there was any implied contract or sufficient testimony as to the facts necessary to create an implied contract, to submit the question to a jury.

It is true, as stated in Phœnix Brewing Co. v. Weiss, 23 Pa. Superior Ct. 519, that, "It is well settled that the fact of depositing in the post office a properly addressed prepaid letter raises a natural presumption, founded in common experience, that it reached its destination by due course of mail," but it is clearly shown by the testimony of both plaintiff and defendant that the bills referred to were not properly addressed to the defendant's post office. If they had been, would they convey to the defendant notice that the particular black mare which he had directed to be killed not only had not been killed, but that the plaintiff, with whom he had no contract for her keep, and as to whose tenancy of the Erdenheim farm, so far as appears by the testimony, he had no notice, had the mare in charge and expected him to pay for her board? In view of the failure of the plaintiff to deny the statement of McCloskey that the defendant had directed the mare Lillian to be killed and of his failure to show that the contents of his books and of the bills alleged to have been sent to the defendant, identified the mare which he kept as the defendant's property, we think that both the third and fourth assignments of error, which relate to the charge of the court, should be sustained.

We are of opinion, also, that the court should have given binding instructions for the defendant for the same reasons. If it had been clearly shown that a bill, showing the plaintiff as the successor of the McCloskey estate in the lease and good will of the Erdenheim farm and clearly identifying the black mare Lillian as the one in his care and custody, being fed for and on account of the defendant, had been sent to the proper post-office address of the defendant, a prima facie case of an implied contract between the plaintiff and defendant might perhaps have been made out, so as to carry the question to the jury; but it is not necessary to decide that question inasmuch as it is not shown that the bill said to have been rendered by the plaintiff to the defendant put the latter upon notice that his instructions in regard to the killing of the animal named Lillian had not

been carried out, and that the plaintiff was in any way in charge of her, so as to make it incumbent upon him to make inquiry in regard to the matter. We do not think, therefore, a case for the jury was established by the testimony of the plaintiff. A nonsuit might have been properly granted, the refusal to do which is not reviewable here; but, as we look at the case in its entirety, the defendant was entitled to binding instructions and, therefore, the fifth assignment of error is also sustained.

Judgment reversed.